[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-16511

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 28, 2003
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-01058-CV-ORL-28

CAST STEEL PRODUCTS, INC.,

Plaintiff-Appellant,

versus

ADMIRAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(October 28, 2003)**

Before BLACK and FAY, Circuit Judges, and JORDAN[*], District Judge.

FAY, Circuit Judge:

_____

[*]Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

Cast Steel Products, Inc. ("Cast Steel") appeals an adverse summary judgment granted to Admiral Insurance Company ("Admiral") on Cast Steel's action for a declaration that either (or both) of its 1999 and 2000 "claims-made" professional liability policies with Admiral covered a defective product claim that accrued at the conclusion of the 1999 policy period but was not reported until the start of the 2000 policy period. The district court found that neither policy provided coverage for the claim because the claim had not both accrued and been reported to Admiral during the same policy period. Cast Steel argues on appeal that the 1999 Professional Liability Policy ("99 Policy") is ambiguous with respect to coverage of the 1999 claim upon renewal of the 99 Policy in 2000. Specifically, Cast Steel contends that because the 99 Policy automatically extends the claims reporting period upon *cancellation* or *non-renewal* of the policy, but is silent as to whether *renewal* of the policy would provide the same reporting extension, an unresolved ambiguity exists in the policy that precluded the district court from granting summary judgment.

We agree that the 99 Policy is ambiguous. We further find that, because under Florida law an ambiguity in an insurance policy must be construed in favor of the insured so as not to deny coverage, summary judgment should have been granted to Cast Steel. *Swire Pacific Holdings, Inc. v. Zurich Ins., Co.*, 845 So. 2d

161, 165 (Fla. 2003). Accordingly, we REVERSE the district court's order granting summary judgment in Admiral's favor, and REMAND to the district court with instruction to enter summary judgment in Cast Steel's favor as to the 99 Policy.

I.

Cast Steel is a Florida corporation in the business of supplying castings and components to the mining and waste energy industries. In early 1999, it purchased professional liability insurance from Admiral, a surplus lines insurer headquartered in Delaware, through Admiral's designated surplus lines broker in the state of Florida, Gary Markel.[1] The 99 Policy had a retroactive effective date of January 6, 1999 and an expiration date of January 6, 2000, at 12:01 a.m. Cast Steel subsequently renewed the 99 Policy, and the renewal policy had an effective date of January 6, 2000, and expiration date of January 6, 2001 ("00 Policy").[2] Both policies, by their terms, were "claims-made" policies, which meant that each policy

---

[1]Cast Steel actually purchased the 99 Policy through Ayers/Sierra, a local insurance broker. Because Ayers/Sierra was not in the business of selling surplus lines insurance, it sought out Markel, a surplus lines agent for Admiral's products in Florida.

[2]Cast Steel also purchased a commercial general liability policy from Admiral in early 1999 (the "CGL Policy"), and it sought declaratory relief under that policy as well. The district court ultimately determined that the CGL Policy, by its plain language, did not cover the claim at issue. Cast Steel does not challenge that finding on appeal. Thus, in order to avoid confusion, we focus only on the professional liability policies (which we refer to as the "99 Policy" and "00 Policy") in this opinion.

3

purported to cover only those claims which had both accrued *and* were reported to Admiral during the policy period indicated on the face of the policy.

Sometime in early 1999, Cast Steel was awarded a contract to provide 130 pallet cars to Hibbing Taconite ("Hibbing"), an iron ore mine located in Hibbing, Minnesota, for the purchase price of $5.5 million. Cast Steel delivered the cars in June 1999. Soon thereafter, in August 1999, Hibbing reported significant problems with the wheels of the cars, which, after some investigation, Cast Steel determined to be caused by defective design of the bearings. On October 21, 1999, Hibbing prepared an incident report and formally reported its claim to Cast Steel. Cast Steel immediately advised Ayers/Sierra of the Hibbing claim and asked that the proper claim paperwork be prepared. In an unfortunate twist of fate, Ayers/Sierra failed to submit the Hibbing claim to Admiral until January 6, 2000 – just hours after the 99 Policy had expired.

On February 10, 2000, Admiral sent Cast Steel a reservation of rights letter and began investigating the Hibbing claim.[3] After four months of investigation by an independent claims adjuster, Admiral sent Cast Steel a letter denying coverage

---

[3]Admiral sent the reservation of rights letter only as to the CGL Policy, and Cast Steel argues that, as a result, Admiral never reserved its right to deny coverage under the 99 or 00 Policies. We find this argument unavailing, however, because Cast Steel only made a claim under the CGL Policy, and Admiral took it upon itself to determine whether any of Cast Steel's three policies provided coverage.

under all policies.

This suit followed on July 25, 2001. Cast Steel originally brought the action in Florida state court, seeking, *inter alia*, a declaration that at least one of the various policies obligated Admiral to cover the Hibbing claim. Admiral removed the action to the Middle District of Florida on diversity grounds and, in July 2002, Cast Steel moved for summary judgment on the 99 Policy. Admiral's own summary judgment motion followed. On October 24, 2002, the district court entertained oral argument and in November granted summary judgment to Admiral, finding that none of the policies provided coverage to Cast Steel.

Specifically, the district court determined that Cast Steel failed to comply with the 99 Policy's notice requirement when it failed to report the Hibbing claim during the 99 Policy period. As to the 00 Policy, the court held that because the Hibbing claim accrued during 1999, and Cast Steel was undisputedly aware of the claim when it renewed the policy, the plain language of the 00 Policy precluded coverage.[4] With respect to Cast Steel's argument that Admiral was on notice of its claim because Admiral (or Admiral's surplus lines broker Markel) cloaked Ayers/Sierra with apparent authority to receive claims on Admiral's behalf, the

---

[4]Section II(B)(2)(a) of the 00 Policy indicates claims arising prior to the effective date of the policy are covered only if the insured had no knowledge of the claim as of the date of signing the application for the policy.

district court found that Cast Steel failed to show that Admiral ever represented to Cast Steel that Ayers/Sierra was its agent in this regard and, moreover, the record showed that Ayers/Sierra itself adamantly denied being Admiral's agent or ever making a representation to Cast Steel that it was Admiral's agent.

Cast Steel asserts on appeal that the district court erred in granting summary judgment to Admiral because issues of fact remained as to whether Ayers/Sierra was cloaked with apparent authority to receive claims on behalf of Admiral. Cast Steel also argues that an unresolved ambiguity as to whether renewal of the 99 Policy extended the period in which it could report claims precluded summary judgment on Admiral's behalf.

## II.

We review a district court's granting of a motion for summary judgment *de novo*, applying the same legal standards used by the district court. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999). We "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999) (quoting *Clemons v. Dougherty County*, 684 F.2d 1365, 1368 (11th Cir. 1982)). Denial of summary judgment is also reviewed *de novo*. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).

6

The district court's decision presents a somewhat alarming scenario. Faced with two consecutive insurance policies that created apparently seamless coverage over two policy periods, the court nevertheless found that a claim accruing within the two periods was somehow not covered by either policy. On the face of the 99 and 00 Policies, there appears to be no gap in coverage. Indeed, the 99 Policy was effective until 12:01 a.m. on January 6, 2000, and the 00 Policy was retroactively effective beginning on January 6, 2000 (presumably at 12:01 a.m.). At a glance, one would be hard pressed to imagine how a claim accruing in the middle of the two policy periods would not be covered by one of the policies. But because a claims-made policy is designed to cover only claims both accruing and reported during the specified policy period, the district court held that a claim which accrued late in the first policy period but was not reported until early in the second was covered by neither policy.

Cast Steel challenges the district court's conclusion, and argues that because the 99 Policy automatically extends (by thirty days) the period in which to report 1999 claims if the insured elects to cancel or non-renew the policy, there remains an ambiguity as to whether renewal provides a similar reporting extension. Subsection B of the "Extended Discovery Period" provision (Section IV) of the 99

Policy provides as follows:

> If the policy is cancelled or not renewed by the Named
> Insured an automatic thirty (30) day Claims Extension
> Period shall apply to claims, provided such claims are not
> covered under any subsequent insurance purchased by
> the Named Insured, or that would be covered but for the
> exhaustion of the amount of insurance applicable to such
> claims.

99 Policy, Sect. IV (B). Cast Steel chose neither of the two options above, but rather renewed the 99 Policy in the following year. Neither this section, nor any section of the 99 Policy, however, discusses whether a similar reporting extension accompanies renewal of the policy. Accordingly, Admiral counters that the policy's silence can only mean that the same reporting extension does not accompany renewal.

The district court, siding with Admiral, did not find any ambiguity in the 99 Policy. Granting summary judgment in Admiral's favor, the district court relied on the Southern District of Florida's 2001 *Pantropic* decision in finding that renewal of the 99 Policy did not extend the time in which Cast Steel could report its claim. *Pantropic Power Prods., Inc. v. Firemen's Fund Ins. Co.*, 141 F. Supp. 2d 1366 (S.D. Fla. 2001). In *Pantropic*, which was affirmed by this Court in an unpublished *per curiam* opinion, the plaintiff offered, and the district court rejected, the identical argument to Cast Steel's here. The court in *Pantropic*, in

8

granting insurer's motion for summary judgment, explained that because an insurer undertakes a more limited risk in a claims-made policy, it typically charges a lower premium. *Id*. at 1369. In exchange, the insured is only permitted to make and report a claim during a narrow window of time. Significantly, in the policy at issue in *Pantropic*, that time included the expressed policy period plus a 60-day grace period. *Id* at 1370. Because the *Pantropic* plaintiff submitted its claim 16 days after the 60-day grace period expired, it was not entitled to coverage even though it had renewed its policy for consecutive years with insurer. *Id*. at 1369–70.[5]

This Court was able to identify only one case in which a court, when faced with a nearly-identical factual scenario, found in favor of the insured. In *Helberg*, the Sixth District of Ohio determined that a claim accruing during Year 1 of a claims-made policy, but not reported until the Year 2 policy period (which, like here, was a renewal of Year 1), was covered by the *Year 1* policy pursuant to the

_____

[5]This particular scenario has only been addressed by a few other district courts. In *Ehrgood*, the court reached the same conclusion as the Southern District in *Pantropic*. *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp. 2d 438 (M.D. Pa. 1998). However, in *Ehrgood*, as in *Pantropic*, the Year 1 policy provided the insured a 60-day grace period in which to report claims accruing during the first policy period, and insured reported its claim outside this window. *Id*. at 447. The insurer prevailed in *Checkrite* as well, but the court noted that even if it were to give the insured the benefit of the additional 60- or 90-day grace period contemplated by New York insurance law, the insured reported its claim far outside this time frame. *Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 191–194 & n.9 (S.D.N.Y. 2000); *see also Westport Ins. Corp. v. Mirsky*, No. CIV A. 00-4367, 2002 WL 31018554, at *11 (E.D. Pa. Sept. 10, 2002) (district court reached the same conclusion but was not faced with the extended reporting provision present in this matter).

9

(albeit ambiguous) reporting extension clause contained therein. *Helberg v. Nat'l Union Fire Ins. Co.*, 657 N.E.2d 832, 833–35 (Ohio Ct. App. 1995).

Plaintiff in *Helberg*, an attorney, initiated litigation against his malpractice insurer ("National"), when National refused to indemnify him in a malpractice action brought by a former client. *Id.* at 833. Plaintiff was undisputedly aware of the claim against him on October 21, 1991, but failed to report the claim to National until January 21, 1992. His 1991 claims-made policy provided coverage from December 11, 1990, to December 11, 1991 – thus he did not report his claim to National until six weeks after the conclusion of the 1999 coverage period. However, plaintiff purchased a renewal of his 1999 policy, which had a retroactive effective date of December 11, 1991, and therefore believed that he was covered by malpractice insurance at all times with National. *Id.* National denied coverage, asserting that the 1991 claim was not covered because it was not reported during the 1991 policy period. *Id.*

The court, recognizing that a claims-made policy requires that notice of action against the insured must be presented to the insurer within the designated time period of the policy, nonetheless found that plaintiff's claim was covered by the 1991 policy. Finding support in the policy's extended reporting endorsement, the court explained:

> In the present case, there was no cancellation of
> coverage, nor did the insured change insurance carriers.
> The insured merely renewed his claims-made policy.
> *Such an event should not precipitate a trap wherein*
> *claims spanning the renewal are denied.*

*Id*. at 834 (emphasis added). The policy at issue in *Helberg,* like the policy in our case, did not provide the insured with a grace-period after expiration of the policy to report claims. *Cf. Pantropic*, 141 F. Supp. 2d at 1369. But – and again similar to the 99 Policy here – the *Helberg* policy's extended reporting clause set out only two circumstances when purchase of a reporting extension was necessary to maintain coverage – upon cancellation or non-renewal.[6] *Helberg*, 657 N.E.2d at 835. The Ohio court continued:

> Applying the time-honored maxim of construction,
> *expressio unius est exclusio alterius*, the inclusion of
> specific things implies the exclusion of those not
> mentioned, this court can only conclude that the inclusion
> of "non-renewal" of the policy as one of those
> circumstances demanding the purchase of an extended
> reporting endorsement excludes a "renewal" as a
> circumstance which demands such a purchase. Since
> appellant's position here was a renewal rather than a
> "non-renewal" or "cancellation," this court concludes
> that the language of the contract does not deny coverage
> in this context.

*Id*. at 835.

---

[6]Note that in *Helberg* the insured was entitled to *purchase* a reporting extension pursuant to the extended reporting clause. Here, the extension was *automatic* upon non-renewal or cancellation.

11

We concur with the reasoning set forth in *Helberg*. Though we are sympathetic to the rationale of *Pantropic*, and would generally agree that the lower premium charged for a claims-made policy should entitle an insured to lesser coverage than a broader, and more expensive, occurrence policy, we find it both illogical and inequitable to deny coverage to the insured who chooses to renew its claims-made policy for successive years with the same insurer – particularly in the scenario we are faced with here. Cast Steel's claim was reported to Admiral mere hours after the expiration of the 99 Policy, and during a time period in which the 00 Policy had become effective. As the *Helberg* court noted, if choosing to cancel or non-renew provided the insured with an extended reporting period, electing to continue to do business with the same insurer by renewing the claims-made policy certainly "should not precipitate a trap wherein claims spanning the renewal are denied." *Helberg*, 657 N.E.2d at 834.[7]

It seems to us that the most reasonable interpretation of the extended reporting clause is that it automatically extends the reporting period through

---

[7]It is also worth noting that Admiral, unlike the insurer in *Pantropic*, concedes that the 00 Policy was a renewal of the 99 Policy. Thus, the *Pantropic* court's reason for rejecting the logic of *Helberg* – that is, because the policy at issue in *Helberg* specifically contemplated continuous renewal – is not availing here. Admiral does not contend, as the insurer in *Pantropic* did, that the 00 Policy was a separate and distinct policy rather than a renewal of the 99 Policy. Indeed, Admiral refers to the 00 Policy as a "renewal policy" throughout its briefs.

12

renewal.  The clause is clearly ambiguous on this point.[8]  Accordingly, because we find a clear mandate in Florida law to construct a contract of insurance in favor of the insured and strictly against the drafter, we hold that the ambiguity in the 99 Policy must be resolved so as not to deny coverage.  *Swire Pacific Holdings*, 845 So. 2d at 165.  We find that Cast Steel's renewal of the 99 Policy in 2000 extended the time in which to report the Hibbing claim.  As Cast Steel reported the claim immediately after the expiration of the 99 Policy, the district court erred when it denied coverage.[9]

### III.

Finally, Cast Steel challenges the district court's failure to require Admiral to refund Cast Steel a $2500 deductible which Admiral collected under the policy. Although the district court determined the deductible was improperly billed, it did not award Cast Steel damages in this amount.  However, because we find that the 99 Policy covers the Hibbing claim, a logical outcropping of our decision is that

---

[8]Counsel for Admiral has been unable to explain what the reporting period would be for claims accruing on the last day, or within a very short period, of the conclusion of the policy period.  Again, unlike the policy in *Pantropic*, the policy in question provides for no grace period following its expiration for reporting claims.

[9]In view of our holding it is not necessary for us to discuss the issue of whether or not there existed genuine issues of material fact on the question of agency.  However, for the sake of completeness we state that a review of the record convinces us that such do exist.  Based upon the evidence in this record a jury could conclude that Admiral cloaked Ayers/Sierra with the apparent authority to receive claims on its behalf.

Cast Steel would have been required to pay Admiral the deductible under the policy. Accordingly, Cast Steel is not entitled to a refund of the deductible.

IV.

For the above reasons, we reverse the district court's decision and remand to the district court with instruction to enter summary judgment in Cast Steel's favor on the 99 Policy.

REVERSED and REMANDED with instructions.