[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-10481

_____

D. C. Docket No. 02-00376-CV-ORL-28-JGG

JOSEPH KONIKOV,

Plaintiff-Appellant
Cross-Appellee,

versus

ORANGE COUNTY, FLORIDA,
JOEL D. HAMMOCK, as an individual
and/or as an agent/employee of
Orange County, Florida, et al.,

Defendants-Appellees
Cross-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(June 3, 2005)

Before ANDERSON and WILSON, Circuit Judges, and JORDAN[*], District Judge.

PER CURIAM:

Rabbi Joseph Konikov, a resident of Orange County, Florida, appeals the district court's grant of summary judgment in favor of Defendants Orange County, Florida, and members of the Orange County Code Enforcement Board on his claim that the Orange County zoning code violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA" or the "Act"), 42 U.S.C. § 2000cc *et seq.*[1] Because the district court erred with respect to Konikov's RLUIPA claim

---

[*] Honorable Adalberto J. Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

[1] Konikov also appeals the district court's grant of summary judgment in favor of Defendants on his claims of state and federal constitutional violations, civil conspiracy, and violation of the Florida Religious Freedom Restoration Act ("RFRA"), Fla. Stat. ch. 761.01. We sustain his RLUIPA and his due process challenges to the ordinance. We affirm the district court's disposition of all other claims, with the following exception: We do not reach Konikov's equal protection, free exercise, freedom of speech, and freedom of assembly claims to the extent that these constitutional claims rely on the same theories underlying the claims dismissed by the district court and reversed in this opinion, because full relief is available under the statute. *See* 42 U.S.C. § 2000cc-2 ("A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S. Ct. 152, 154 (1944); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."); *White v. State of Ala.*, 74 F.3d 1058, 1071 n.42 (11th Cir. 1996) (reversing district court judgment on grounds that it violated the Voting Rights Act, and declining to reach question of whether the judgment also violated the Equal Protection Clause); *United States v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1547 n.21 (11th Cir. 1987)

2

and his due process claim, we reverse and remand to the district court for proceedings consistent with this opinion.

## *Background*

Orange County, Florida, is the most populous county in central Florida, as well as the home of Disney World, Sea World, and Universal Studios. Nearly one million people are regular residents of Orange County, not including the throngs of tourists that swell the County's ranks daily. Orange County is comprised of a large swath of unincorporated land as well as several cities including Orlando, where the Appellant resides.

## I. The Challenged Ordinance

Chapter 38 of the Orange County Code ("OCC" or "the Code") establishes a comprehensive zoning scheme, dividing the County into districts and setting forth the restrictions that apply to each district. For properties in residential R-1A districts, such as the property at issue in this case, the Code permits single-family homes, accessory buildings, home occupations, model homes, and family day care homes, but requires an application to the zoning board for a "special exception" for other land uses. OCC § 38-77. Among the uses requiring a special exception

(reversing district court judgment on grounds that it violated supplemental rules on judicial forfeiture and declining to reach Fourth Amendment challenge to same judgement, even though statutory ground was not argued in initial brief).

are "religious organizations" and day care centers.  *Id.*  In order to operate a "religious organization" in an area zoned R-1A, a landowner or tenant must submit an application to the Orange County Board of Zoning Adjustment–an entity distinct from the Code Enforcement Board ("CEB"), which determines whether a violation has occurred.  The application for a special exception must be accompanied by a $912 fee and a survey or plan indicating the proposed changes to the property.

## II.  The Litigants

Konikov resides in Sand Lake Hills, a neighborhood in Orange County.  Konikov's property is located in a residential district zoned R-1A.  Though previously a tenant, he purchased the property on March 7, 2002.  Orange County alleges that, as the head of one of six *Chabad*[2] organizations in the greater Orlando area, Konikov is operating a religious organization in violation of the Code.  As part of his activities as a *Chabad* rabbi, Konikov held meetings on Friday nights and Saturday mornings, in addition to other meetings for Torah study and celebration of holidays.  The parties hotly debate the frequency of these

---

[2] *Chabad* refers here to a particular movement/philosophy/denomination within Orthodox Judaism that emphasizes certain mystical teachings, as well as outreach and education in the Jewish world.  *See* Arthur Green & Shaul Magid, *Hasidism:  Habad Hasidism*, *in* ENCYCLOPEDIA OF RELIGION (Lindsay Jones ed., 2d ed. 2005).

gatherings. We discuss the evidence adduced by each party below in our consideration of Konikov's RLUIPA claim.

Starting in early 2001, residents of the Sand Lake Hills subdivision began to complain to the Code Enforcement Division about Konikov's use of his property. The Enforcement Division began recording the results of their investigation of Konikov's property on or about July 13, 2001, and continued to observe the property through March 18, 2002. During that eight-month period, the investigators observed the property on sixty-eight days and reported activity on forty-nine of those days. In summarizing their findings, the investigators simply noted the number of cars and people that they observed at the residence.

On May 9, 2001, Code Enforcement Officer LaPorte issued a Code Violation Notice for "operating a synagogue or any function related to a synagogue and or church services is not a permitted use in residential zoned area." The CEB scheduled a hearing for June 20, 2001, that was subsequently canceled. Code Enforcement Officer Caneda issued another Code Violation Notice on February 4, 2002, allowing Konikov seven days to bring his property into compliance. The Notice stated that Konikov was in violation for operating a "religious organization . . . from a residential property without special exception approval. Corrective action to be taken: Obtain special exception approval or

5

cease religious organization operations." At the March 20, 2002, hearing, the CEB found that Konikov had not complied with the Code and that he continued to violate sections 38-3, 38-74, and 38-77 of the Code for operating a religious organization in a residential subdivision zoned R-1A. The CEB ordered that Konikov correct the violation by May 19, 2002. The order also stated that he would be subject to a daily fine of $50.00 for each day the violation continued beyond May 19. After the Code Enforcement Division determined during reinspection that Konikov had not come into compliance, the CEB created a lien upon Konikov's property. As of oral argument, Orange County continued to fine Konikov daily.

### III. Procedural History

Konikov has never applied for a special exception to the Code, nor did he appeal the CEB's finding to the state circuit court as permitted by Fla. Stat. ch. 162.11. Rather, after the CEB entered its finding on March 20, 2002, Konikov filed a complaint seeking compensatory damages and injunctive and declaratory relief under 42 U.S.C. § 1983. In his complaint, Konikov alleged that the Code violates the U.S. Constitution and state and federal statutes and that members of the CEB engaged in civil conspiracy.

The district court denied Konikov's first and second Motions for

Preliminary Injunction, and denied Konikov's Motion to Recuse. Orange County moved for Summary Judgment. Opposing Orange County's motion, Konikov claimed that the only evidence that should be considered for the as-applied challenge was the evidence before the CEB at the March 20 hearing. In response, Orange County filed an Alternative Motion for Summary Judgment, which was granted with respect to the as-applied equal protection challenge. The court found that Konikov was not similarly situated to Paul Bosch, a neighbor who held weekly, and sometimes biweekly, prayer meetings. The district court also granted summary judgment in Orange County's favor on the facial constitutional challenges, the conspiracy claim, and the allegations of federal and state statutory violations, holding that these claims were without merit. This appeal followed.

### *Standard of Review*

We review questions of law such as the construction and constitutionality of a statute *de novo*. *See Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1277 (11th Cir. 2001). A district court's grant of summary judgment is reviewed *de novo* as well, and we apply the same legal standards that bind the district court. *See NAACP v. Hunt*, 891 F.2d 1555, 1559 (11th Cir. 1990). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

7

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *see Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). On a summary judgment motion, we "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1301 (11th Cir. 2003) (internal quotation and citations omitted).

## *Discussion*

### I. Ripeness

Article III of the U.S. Constitution, limiting the jurisdiction of federal courts to actual cases or controversies, requires that we consider whether Konikov's claims are ripe for judicial review. U.S. CONST. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S. Ct. 2130, 2136 (1992). At times, even when the constitutional requirements are met, we may refrain from intervention for prudential reasons. *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). The purpose of this doctrine is to avoid "entangling

8

[our]selves in abstract disagreements," and also to shield agencies from judicial interaction "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S. Ct. 1507, 1515 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977).

In deciding the ripeness of a claim, we inquire into 1) whether the issues are fit for judicial decision and 2) the hardship to the parties of withholding court consideration. *Digital Properties*, 121 F.3d at 589 (citing *Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. at 1515). This inquiry into ripeness ensures that the plaintiff has suffered a sufficient injury to meet Article III's case or controversy requirement; it also permits us to determine "whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995).

When a plaintiff brings an as-applied challenge to a zoning ordinance, we require that the plaintiff prove simply that the ordinance has been "finally applied to the property at issue." *Eide v. Sarasota County*, 908 F.2d 716, 725 (11th Cir. 1990). This satisfies our injury requirement as well as our prudential concern that the case before us permit effective decisionmaking.

Of the claims that we consider below, we conclude that only Konikov's

as-applied challenges have merit.  As such, their ripeness is apparent because the zoning code at issue has, in fact, been applied to Konikov.  *See Jackson v. Okaloosa County*, 21 F.3d 1531, 1541 n.16 (11th Cir. 1994); *Eide*, 908 F.2d at 725.  The Code Enforcement Board, after its March 22 hearing, found Konikov in violation and fined him for failing to bring his property into compliance.  He suffers from an actual, concrete injury.  The imposition of the fine indicates that the Code Enforcement Board had made a final decision to apply the Code to Konikov.  *Cf. Tari v. Collier County*, 56 F.3d 1533, 1536 (1995) (holding that merely issuing Notice of Violation did not constitute a final decision).  Therefore, his as-applied claims are ripe for our review.

As for the distinct question of whether a plaintiff must exhaust administrative remedies before bringing a § 1983 claim, *Patsy v. Florida Board of Regents* has already answered in the negative.  457 U.S. 496, 102 S. Ct. 2557 (1982).

## II.  RLUIPA

Konikov challenges the ordinance under two distinct subsections of RLUIPA.  First, he claims that the ordinance places a substantial burden upon his religious exercise in violation of § (a)(1).  Konikov also claims that the ordinance treats his religious assembly on less than equal terms with nonreligious assemblies

in violation of § (b)(1). We consider each of these claims to determine whether the district court erred in granting summary judgment in favor of Orange County.

## A. Substantial Burden on Religious Exercise

The "substantial burden" provision of RLUIPA, which appears in § (a)(1), sets forth the following:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution–
> (A) is in furtherance of a compelling interest; and
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

Before determining whether a substantial burden exists, however, we must first ensure that one of RLUIPA's three jurisdictional tests is met. We may exercise jurisdiction in this case because the OCC is a "land use regulation . . . under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). The OCC does not permit religious organizations to operate in R-1A areas without special exception approval. The Code Enforcement Officers and the CEB must determine in each case whether a particular use of the land goes beyond occasional, casual

11

gatherings and constitutes an "organization" in violation of the Code. Congress was concerned about such individualized scrutiny because it runs the risk that the standards in such regulations will be applied in an unequal fashion. Because the OCC provides for individualized assessments, we may exercise jurisdiction over Konikov's § (a)(1) substantial burden claim.

### 1. Religious Exercise

To qualify as "religious exercise" under RLUIPA, the practice need not be compelled by, or central to, a system of religious belief. *See* 42 U.S.C. § 2000cc-5(7)(A). Rather, religious exercise under RLUIPA includes the "use, building, or conversion of real property for the purpose of religious exercise. . . ." 42 U.S.C. § 2000cc-5(7)(B). It is undisputed that Konikov's challenge to Orange County's zoning scheme concerns "religious exercise" as defined by RLUIPA.

### 2. Substantial Burden

Our recent decision in *Midrash Sephardi, Inc. v. Town of Surfside* explains what is meant by "substantial burden":

> [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

366 F.3d 1214, 1227 (11th Cir. 2004). We also noted that requiring applications

for variances, special permits, or other relief provisions would not offend

RLUIPA's goals. *Id.* at 1235 n.17 (quoting 146 CONG. REC. S7774-01, S7776

(2000) (joint statement of Sens. Hatch and Kennedy on the Religious Land Use

and Institutionalized Person Act of 2000)).

The zoning ordinance at issue requires Konikov to apply to the Board of

Zoning Adjustment for a special exception in order to operate a "religious

organization." It does not prohibit Konikov from engaging in religious activity.

Because application for a special exception does not coerce conformity of a

religious adherent's behavior, we hold that such an application requirement does

not impose a substantial burden as defined by RLUIPA.[3]

## B. Equal Terms

Section (b)(1) of RLUIPA, also known as the "equal terms" provision, reads

as follows:

> No government shall impose or implement a land use regulation in a manner
> that treats a religious assembly or institution on less than equal terms with a
> nonreligious assembly or institution.

---

[3] Konikov claims that he was not permitted to apply for a special exception. Apparently, the title to Konikov's property contained restrictions and covenants originating from the Sand Lake Hills Homeowners' Association that forbids application for special exceptions. Such a prohibition might constitute a constitutional violation and substantial burden in violation of RLUIPA. *See Shelley v. Kraemer*, 334 U.S. 1, 68, S. Ct. 836 (1948). We need not address this hypothetical issue, however, because Konikov has never raised it.

42 U.S.C. § 2000cc(b)(1).

In *Midrash*, we left open the question of whether the jurisdictional requirements found in § (a)(2) apply to § (b)(1), RLUIPA's equal terms provision. 366 F.3d at 1229–30. Once again we have no occasion to answer this question of statutory interpretation because the conduct alleged by Konikov satisfies § (a)(2)(C), which permits jurisdiction when a governmental body implements a land use regulation in which it makes "individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).

Having found that jurisdiction is proper in this case, we turn to Konikov's claims under the equal terms provision. Konikov challenges both the distinctions made by the Code itself as well as the manner in which it is implemented. We consider each of these claims separately, as one constitutes, in essence, a facial challenge to the Code, and the other an "as applied" challenge.

### 1. Facial Challenge

*"Similarly Situated"*

For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is "similarly situated" to the other, as in our familiar equal protection jurisprudence. *Midrash*, 366 F.3d at 1230. Rather, the relevant

14

"natural perimeter" for comparison is the category of "assemblies and institutions" as set forth by RLUIPA. *Id.* In other words, the question is whether the land use regulation or its enforcement treats religious assemblies and institutions on less than equal terms with nonreligious assemblies and institutions.

In *Midrash*, we determined that the zoning ordinance at issue there defined "private club" in such a way that it qualified as an "assembly" under RLUIPA. *Id.* at 1231. Additionally, we found that churches and synagogues, entities excluded from the business district, fell within the perimeter of "assemblies and institutions" subject to RLUIPA. *Id.* We concluded that the ordinance violated the equal terms provision of RLUIPA because it permitted private clubs in the business district, but excluded churches and synagogues. *Id.* Following this framework, we must first determine whether the entities at issue, both religious and nonreligious, qualify as an "assembly or institution," as the term is used in RLUIPA. *Id.* at 1230. Then we will evaluate whether the Code impermissibly distinguishes between religious and nonreligious organizations.

In construing the terms "assembly" and "institution," we attribute to them their ordinary or natural meanings because RLUIPA does not define them. *Id.*; *see also Nat'l Coal Ass'n v. Chater*, 81 F.3d 1077, 1081 (11th Cir. 1996). An "assembly" is defined as "a company of persons collected together in one place

15

and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)." *See* WEBSTER'S 3D NEW INT'L UNABRIDGED DICTIONARY 131 (1993); *see also* BLACK'S LAW DICTIONARY 124 (8th ed. 2004) (an assembly is a "group of persons organized and united for some common purpose"). More formal is the definition of "institution," which is "an established society or corporation: an establishment or foundation [especially] of a public character . . . ." WEBSTER'S 3D NEW INT'L UNABRIDGED DICTIONARY 1171 (1993); *see also* BLACK'S LAW DICTIONARY 813 (8th ed. 2004) (defining "institution" as "[a]n established organization, [especially] one of a public character").

Next, we look to the Code to determine whether the religious entities at issue are subject to RLUIPA. Though Konikov was cited for operating a "religious organization," the Code fails to define this term.[4] Consequently, we give it its ordinary or natural meaning. *See Midrash*, 366 F.3d at 1230; *Nat'l Coal Ass'n*, 81 F.3d at 1081. An organization is "a group of people that has a more or less constant membership, a body of officers, a purpose, and [usually] a set of regulations" or "a purposive systematic arrangement." WEBSTER'S 3D NEW INT'L

---

[4] The Code defines "religious institution" as a "premises or site which is used primarily or exclusively for religious worship and related religious activities." OCC § 38-1. The term "institution," as defined by the Code is more formal and implies a more fixed nature. This meaning is distinct from the ordinary and natural meaning of "organization," the term with which we are concerned here. The term "organization" has a more inclusive, broader connotation than an "institution," with a less formal arrangement.

16

UNABRIDGED DICTIONARY 1590 (1993); *see also* BLACK'S LAW DICTIONARY 1133 (8th ed. 2004) (defining an "organization" as "[a] body of persons . . . formed for a common purpose"). In short, a religious organization is an assembly, a group gathered with a common purpose related to religion, and is therefore subject to RLUIPA's restrictions.

With respect to nonreligious activity, the Code permits certain activities without the need for a permit, whereas religious institutions require an application for a special exception. Specifically, the Code permits "family day care homes," "model homes," and "home occupations." We consider each of these uses to determine whether they qualify as "assemblies" or "institutions" for purposes of comparison under RLUIPA's equal terms provision.

A family day care home is defined as a residence in which child care is regularly provided for no more than ten children. *See* OCC § 38-1; *see also* Fla. Stat. ch. 402.302. State law requires that this use be permitted in residential areas without application for a special exception. *See* Fla. Stat. ch. 125.0109. Loosely understood, a family day care home could qualify as an assembly. However, because we conclude that the classification could withstand strict scrutiny, *see infra*, we need not decide whether children gathered for the purpose of receiving care constitutes an assembly.

Next, Konikov challenges the classification of "model homes." "Model homes" are temporary uses that aid a developer in selling homes in a subdivision. *See* OCC §§ 34-7(c)(1), 38-79(125); R. at 218, Ex. 7 (Bd. of County Comm'rs of Orange County, Res. No. 95-M-20 (1995)). According to § 38-77, model homes are a permitted use in residential areas. Developers seeking to build model homes are not required to apply for a special exception. However, developers must apply for approval to build model homes, and this request must be accompanied by plans of the lot and subdivision. *See* OCC § 38-79(125) (permitting model homes in accordance with Resolution No. 95-M-20 and requiring that model homes be approved only in conjunction with an approved preliminary subdivision plan); R. at 218, Ex. 7 (Bd. of County Comm'rs of Orange County, Res. No. 95-M-20 (setting forth review mechanism)). Because an application is required for both model homes and religious organizations, they are not treated on different terms as Konikov claims. The precise procedures and the body to which they must apply differ, but these are distinctions without a difference. Furthermore, model homes are not "assemblies" subject to RLUIPA. Prospective buyers neither convene simultaneously, nor do they share a common purpose. Rather, each buyer has a distinct individual purpose. Because model homes are not "assemblies," the Code's treatment of model homes as compared with that of religious organizations

18

does not constitute an equal terms violation.

Likewise, "home occupations" are not assemblies. The Code defines "home occupations" as "any use conducted entirely within a dwelling or accessory building and carried on by an occupant thereof, which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes and does not change the character thereof." OCC § 38-1. The Code notes that the sale of handicrafts made on the premises is the paradigmatic "home occupation." *Id.* The Code limits the amount of floor space that can be dedicated to the enterprise and prohibits the outside display of items and the use of mechanical equipment. *Id.* Important to our analysis is the fact that the Code limits participation in a "home occupation" to two members of the family. Because the Code's definition of "home occupation" is highly circumscribed, requiring that the use be incidental and limiting participation to two family members, it is not an "assembly" or "institution" under RLUIPA. Therefore, RLUIPA does not apply, and we do not compare the Code's treatment of these land uses.

### *Level of Scrutiny*

As we observed in *Midrash*, RLUIPA requires us to determine whether a system of land use classifications "subtly or covertly departs from requirements of neutrality and general applicability." *Midrash*, 366 F.3d at 1232. A zoning law

that treats religious and nonreligious organizations differently offends the principles of the Free Exercise Clause because it is not neutral or generally applicable. *Id.* RLUIPA directs us to apply strict scrutiny if a land use provision treats religious organizations on less than equal terms than nonreligious organizations. *Id.*

The family day care home is the only classification in the Code that is arguably similarly situated to a religious organization for the purpose of RLUIPA. Even assuming that both uses are assemblies, there is no violation because the classification can withstand strict scrutiny. Permitting family day care homes is a neutral classification because it does not target religious groups. The exception for family day care homes, which would encompass foster homes, simply acknowledges the fundamental right to freedom of personal choice in marriage and family life. *See Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977). Thus, the state has a compelling justification for treating family day care homes differently from other groups.

Furthermore, the classification is narrowly tailored to the interest of protecting choice in the context of the family. The definition itself is carefully circumscribed as it limits the number of children that can be looked after in a family day care home. The classification of family day care homes withstands

strict scrutiny and therefore does not violate RLUIPA's equal terms provision.

## 2. As-Applied Challenge

### *"Similarly Situated"*

Next, we turn to Konikov's contention that the Code was implemented in a manner treating religious organizations on less than equal terms than nonreligious organizations. For this inquiry, we must engage in a thorough review of the record, examining the evidence considered by the CEB when it found Konikov in violation. Even though the Code, on its face, treats all of the relevant comparable groups the same, in practice it is possible for the CEB to treat religious organizations on less than equal terms than nonreligious ones. If, as here, the CEB deems a group that meets three times per week a religious organization, but does not consider a group having comparable community impact a "social organization," that is a violation. In other words, by treating Konikov as a religious organization, the CEB seems to have a different definition of social organization, which is unequal treatment.

In concluding that Konikov operated a "religious organization . . . from a residential property without special exception approval," the CEB considered the frequency of meetings, the number of people and vehicles at Konikov's residence, evidence that Konikov advertised his meetings to the public through websites and

brochures, evidence that the services were available to the public at large and not only to a finite group, and whether religious use was ongoing or temporary. We consider this evidence to discover how, as a practical matter, the CEB defines the term "religious organization."

Viewing the facts in the light most favorable to Konikov, the record establishes that he held two to three meetings of a religious nature at his home per week. In fact, the only uncontroverted evidence establishing the frequency of meetings was the testimony of Jeffrey Lessel. At the March 20, 2002, CEB hearing, Lessel testified that he regularly attended Friday night and Saturday morning "prayer groups" at Konikov's residence. In addition, he attended occasional Bible study meetings on Wednesdays.

Konikov disputes the inferences to be drawn from the remaining evidence, which consists of web sites advertising meetings at Konikov's *Chabad*, an activity report prepared by the Code Enforcement Division, and a sign outside Konikov's house.

The web sites advertised special events, as well as a *minyan*, or small prayer group, on certain days. Visitors to the sites were directed to call the listed number for the location of the services. The district court inferred that the events advertised actually did take place. When considered in conjunction with the

22

activity report, however, a different picture emerges. The report was prepared as part of the Code Enforcement Division's investigation and summarizes the results of an observation period spanning eight months. During that period, Code Enforcement Officers observed the property intermittently, on sixty-nine days in total, noting that no activity took place on nineteen of those days. Because some of the scheduled meetings were to have occurred on days when no activity took place, Konikov argues that the CEB should not have assumed that the activities advertised on the web sites actually occurred. Furthermore, Konikov claims in his affidavit that forty-four of the days on which activity was observed were gatherings for holidays and family birthdays, which do not constitute a violation of the Code. Taken together, Konikov's affidavit and the activity report undermine the inference raised by the web advertisements that Konikov was hosting meetings at his home more than three times per week. At the summary judgment stage, considering the facts in the light most favorable to Konikov as we must, Orange County cannot depend on the web advertisements to show that the prohibited use occurred at the frequency alleged.

Finally, the CEB considered a photograph showing a sign posted on Konikov's door for a short period, which read: "Kindly use the side entrance for the Shul." *Shul* means "synagogue" and is derived from the German word for

23

"school." Although Orange County has stipulated that Konikov's residence was not used as a synagogue, the County argues that the sign indicates Konikov's intent to hold out to the public his house as a meeting place for a religious organization. Konikov replies that the sign was posted only for a brief period and for the limited purpose of cautioning visitors to be respectful of the people praying inside. Accepting Konikov's characterization of the sign, along with Orange County's stipulation that Konikov was not operating a synagogue, we find that the evidentiary value of the sign is minimal.

As noted above, the Code does not define "religious organization." But based on the evidence considered by the CEB, we can glean a working definition. The CEB seems to have considered a "religious organization" to involve publicity and meeting with some regularity for religious purposes. From the evidence before us, that frequency could be as little as two to three times per week. In fact, Officer LaPorte, manager of the Code Enforcement Division, opined that even one meeting per week might constitute a violation. This definition falls far short of the Code's definition for "religious institution," which requires that a site be "used primarily or exclusively for religious worship and related religious activities."

Having examined the CEB's treatment of religious organizations, we turn to its treatment of nonreligious organizations to determine whether the Code is

underinclusive and therefore improperly targets religious uses. Code Enforcement Officer Caneda testified that it would not be a violation for a group to meet with the same frequency as Konikov if the group had a social or family-related purpose.[5] For example, a cub scout troop meeting held two to three times a week would not be a violation. Similarly, friends gathering to watch sports two to three times weekly would not violate the Code. If the assembly's purpose was to celebrate birthdays, holidays, or a simple family dinner, that would not constitute a violation. In other words, a group meeting with the same frequency as Konikov's would not violate the Code, *so long as religion is not discussed*. This is the heart of our discomfort with the enforcement of this provision. The publicity factor makes no difference in our analysis. For example, the cub scouts advertise meetings on the Internet, and it is clear that the Code would still not consider this a violation. Therefore, advertising meetings on the Internet is not dispositive according to the Code.

The Code as implemented by the CEB defines social organizations differently than religious organizations. Groups that meet with similar frequency

---

[5] We note that we are not limited in our inquiry to the evidence considered by the CEB. We may consider evidence of the Code Enforcement Officers because they have discretion to begin investigation into a violation, even if they do not have authority to make a final determination.

are in violation of the Code only if the purpose of their assembly is religious. This treatment of religious assemblies on less than equal terms than nonreligious assemblies constitutes an equal terms violation.

*Level of Scrutiny*

As noted above, if a land use provision treats religious assemblies or institutions on less than equal terms than nonreligious assemblies or institutions, strict scrutiny is the standard by which we evaluate that differential treatment. By applying different standards for religious gatherings and nonreligious gatherings having the same impact, Orange County's CEB impermissibly targets religious assemblies. Orange County has not put forth a compelling justification for this lesser treatment, indicating that the Board has impermissibly targeted religious assemblies in violation of RLUIPA.[6]

## III.  Constitutionality of RLUIPA

Because we find that the district court did not err in granting summary judgment for the defendant with respect to Konikov's § (a)(1) substantial burden claim, the constitutionality of that provision is not properly before us. With

---

[6] For similar reasons, and on the basis of similar evidence (e.g. the testimony of Pastor Urichko and Paul Bosch), we conclude that Orange County has not put forth a compelling justification for the disparate treatment of Konikov as compared to comparable Protestant prayer and fellowship activities. Thus, the County has impermissibly targeted Konikov in this regard also.

26

respect to Orange County's argument that § (b)is unconstitutional, we refer to our holding in *Midrash*, which upheld the constitutionality of that Section. 366 F.3d at 1239–43.

## IV. Due Process

A regulation is void on its face if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 127 (1926). This is because a vague law may trap the innocent by failing to give fair notice of what is prohibited, may risk arbitrary or discriminatory enforcement by delegating too much authority to enforcers, and–when the regulation implicates First Amendment freedoms–may chill the exercise of those freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S. Ct. 2294, 2298–99 (1972). Thus, *Grayned* requires a claimant asserting that a statute is void for vagueness to prove either that the statute fails to give fair notice of wrongdoing or that the statute lacks enforcement standards such that it might lead to arbitrary or discriminatory enforcement. Importantly, the Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech or religion. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1193–94 (1982).

Courts may cure a statute that is vague by statutory interpretation. *High Ol'*

*Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). If a law is

susceptible to an interpretation that supports its constitutionality, we must accord

the law such meaning. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32,

83 S. Ct. 594, 598 (1963) (citations omitted). Where a statute does not define a

term, we must give words their common and ordinary meaning, absent some

established technical definition, unless the legislature intended otherwise. *High*

*Ol' Times*, 673 F.2d at 1229 (citing *Flipside*, 455 U.S. at 501 n.18, 102 S. Ct. at

1194 n.18).

Konikov contends that on its face, the OCC is void for vagueness because it

fails to give fair notice that those wishing to discuss or study religion in their

homes might violate the Code. He also argues that the Code creates a risk of

arbitrary and discriminatory enforcement because it lacks enforcement standards.

We now examine these arguments, applying constitutional principles and rules of

statutory interpretation.

## A. Fair Notice

Though the Code prohibits the operation of a "religious organization," it

does not define the term. The Code does, however, define "religious institution"

as a "premises or site which is used primarily or exclusively for religious worship

28

and related religious activities." OCC § 38-1. In concluding that the Code is not vague on its face, the district court looked to the definition of "religious institution." Because the terms "primarily used" and "related" are readily understood by a person of ordinary intelligence, the court continued, the Code does not offend due process principles. Putting to the side for the moment our intuition that the district court's conclusion does not accord with common sense (three religious meetings per week at a residence cannot be understood reasonably to convert a home into a site primarily used for religious purposes), it misses the point. The court should have analyzed whether the term "religious organization" renders the statute void for vagueness rather than substituting a term that is not equivalent. An "organization" is not the same as an "institution," based on either its ordinary or natural meaning or the statute at issue. Absent a specific statutory provision equating the terms or evidence that the CEB interprets them as equivalents, we will not assume that the terms are interchangeable.

It is true that the issue of whether a statute is void for vagueness is a question of law for the judge, and not the jury, to determine. *See United States v. Paradies*, 98 F.3d 1266, 1284 (11th Cir. 1996). For that reason, our ordinary course would be to reverse or affirm the district court's determination. In this case, because the district court did not clearly state its reasons for substituting a

29

nonequivalent term for the term at issue, we remand for determination of the frequency of meetings necessary to constitute a "religious organization."

## B. Enforcement Standards

The district court found no evidence of arbitrary or discriminatory enforcement in rejecting Konikov's due process argument based on a lack of enforcement standards. Ordinarily, vagueness challenges must be evaluated in the light of the facts of the case at hand. *United States v. Fisher*, 289 F.3d 1329, 1333 (2002) (citing *United States v. Mazurie*, 419 U.S. 544, 550, 95 S. Ct. 710, 714 (1975)). However, when a statute implicates First Amendment rights, we may consider the *risk* of arbitrary enforcement–the possibility that the statute will chill expression. *See Grayned*, 408 U.S. at 109 & n.5, 92 S. Ct. at 2299 & n.5 (noting that uncertain meanings lead citizens to "steer far wider of the unlawful zone" than if the boundaries of the forbidden areas were clearly marked (internal citation and quotation omitted)).

Konikov presented evidence that tends to show that the law does in fact delegate too much authority to those charged with enforcing it. Two members of the Code Enforcement division differed in their opinion of what frequency would trigger a violation. According to Officer Caneda, two meetings per week would not trigger a violation, but three probably would. George LaPorte, the manager of

the division, on the other hand, opined that even one meeting per week could constitute a violation. Although the officers do not make a final determination of violation, they have discretion to initiate an investigation into a possible violation, which can lead to discriminatory enforcement. Because Konikov has produced evidence that the Code has an inherent risk of discriminatory enforcement, he has established the vagueness of the Code. For this reason, we reverse the district court's grant of summary judgment on this claim.

### *Conclusion*

For the foregoing reasons, we reverse the district court's grant of summary judgment with regard to the RLUIPA claims of unequal treatment and with regard to the due process claim, and remand for proceedings consistent with this opinion. As indicated above, we decline to address certain claims.[7] Finding no error in the district court's disposition of the remaining claims raised on appeal, we affirm the district court with respect to these claims.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

---

[7] *See supra* note 1.