[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12984
_____

D.C. Docket No. 1:10-cv-24549-KMW


TEMPLE B'NAI ZION, INC.,
a Florida not-for-profit corporation,

Plaintiff - Appellant,

versus

CITY OF SUNNY ISLES BEACH, FLORIDA,
a Florida municipality,
NORMAN EDELCUP,
individually,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 29, 2013)

Before TJOFLAT and WILSON Circuit Judges, and COOGLER,[*] District Judge.

WILSON, Circuit Judge:

Under the doctrine known as ripeness, we must determine that a given issue is sufficiently developed (i.e., ripe) for judicial intervention before we will exercise jurisdiction over it.  This appeal presents the question whether an Orthodox Jewish synagogue's statutory and constitutional challenges to its designation as a historic landmark by a municipality are ripe for adjudication.  We begin with the background facts necessary to our discussion.

**I.**

Temple B'Nai Zion (Temple) is a Sephardic Jewish religious organization that operates an Orthodox Jewish synagogue in the City of Sunny Isles Beach, Florida ("Sunny Isles Beach" or "City").  The Temple purchased the land on which it is currently situated from the Sunny Isles Epiphany Lutheran Church in 1977.  Because the building had previously housed a Christian church, the Temple made certain modifications to minimize Christian symbols on the property, including removing many of the stained-glass windows and attempting to conceal the cross-shaped design of the main sanctuary.  The Temple then began operating as a Conservative Judaic house of worship, and by 1986 the congregation had grown to some 400 families.

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

2

Over the years that followed, however, the Temple's membership languished, and by the early 2000s only about 100 members remained in the congregation. According to the Temple's complaint, the present saga began in 2004, when the Temple sought out Rabbi Aaron Lankry for assistance in increasing the membership of the congregation and in raising funds for the Temple's operations. Soon thereafter Rabbi Lankry began to align the Temple's religious beliefs with the Orthodox form of Judaism. Orthodox Judaism is a formulation of the religion that adheres to a rather strict interpretation and application of Talmudic law. In Orthodox synagogues, for example, men and women must be seated in separate sections, and the alignment of the synagogue must be such that the congregation faces east—toward Jerusalem—during prayers. Prior to the switch, the Temple had practiced Conservative Judaism, a modern approach to the religion that seeks to conserve traditional elements of the faith but nonetheless permits for some degree of modernization and rabbinical development. According to the Temple, the move from Conservative Judaism to Orthodox Judaism—a more stringent brand of the faith—angered some congregants, including Norman Edelcup, the current mayor of Sunny Isles Beach.

Earlier in 2004, Mayor Edelcup, while still a member of the Temple's congregation, conceived the idea of the City hosting a reunion for Sunny Isles Beach's approximately 300 Holocaust survivors. The event, which was held in the

3

Temple's social hall on March 28, 2004, was attended by roughly 200 of the survivors.

Later that same year, after the Temple became Orthodox and Mayor Edelcup left the congregation, the Temple resolved to bring certain elements of its physical plant into alignment with its Orthodox religious precepts. Specifically, the Temple sought to rectify four issues that did not conform with its Orthodox beliefs: (1) the seating area of the sanctuary was facing west; (2) the floor plan was in the shape of a crucifix (from the building's time as a Lutheran church); (3) the seating area for the main sanctuary lacked separate sections for men and women; and (4) the building was shaped like a triangle to symbolize the Holy Trinity of the Christian faith. Because reconfiguring the building to address these issues would be difficult, the Temple decided to demolish the building and to reconstruct it in accordance with Orthodox religious precepts. To that end, in 2006 the Temple hired an architect to develop plans for a larger, Orthodox house of worship.

The City was not supportive of the Temple's expansion plans, and in the period that followed Rabbi Lankry met with Mayor Edelcup on several occasions to work out the differences. The meetings went badly. At one point, Mayor Edelcup allegedly referred to the Sephardic Jewish community as a "bunch of

4

pigs."[1]  When Rabbi Lankry inquired as to whether he could quote the mayor as to his pejorative comment, Mayor Edelcup responded, "I don't care what the [expletive] you do."  The animosity between the parties now proceeded at full bore: when the Temple rebuffed the City's attempt to purchase the property on which the Temple was situated (the Temple is apparently located adjacent to city hall), Mayor Edelcup directed the City's code enforcement officers to inspect the Temple, and between September 2007 and February 2009, the Temple received 12 separate code violation notices from City officials.

In March 2006, the City's Historic Preservation Board (Preservation Board) met to consider certain properties for possible designation as historic sites.  At that time, no site had ever been designated historic, despite the City's storied and socially significant past.  Sunny Isles Beach was originally developed as a tourist resort in the 1920s, and expanded slowly until the 1940s, when it enjoyed rapid growth in tourism.  The City's first four-story hotel, the Golden Strand, was built in 1946.  Then, in 1949, the nation's first two-story "motor hotel," or motel, known as the Ocean Palm, was built in Sunny Isles Beach.  A stretch of land known as "Motel Row" soon sprung up in the City, and before long there were countless motels in the bustling vacation community.  Celebrities visited Sunny Isles Beach,

---

[1] According to the complaint, Rabbi Lankry is a Sephardic Jew, and Mayor Edelcup has a "personal vendetta against Rabbi Lankry and the Temple's Orthodox Jewish Sephardic membership."

too. The Golden Strand, which still exists today, hosted visitors including Grace Kelly, Burt Lancaster, Mike Todd, and Gary Cooper, as well as members of the Dupont, Vanderbilt, and Guggenheim families. To this day, a plaque in the Sunny Isles Beach Government Center notes that the last Florida residence of the legendary slugger Babe Ruth was at the Golden Strand Hotel, and certain illustrious musical acts such as The Beatles, Ike and Tina Turner, Ray Charles, and Frankie Vallie and the Four Seasons basked in the sun along Motel Row during this period.

The Preservation Board considered five properties for potential historic designation at its March 2006 meeting: (1) the Ocean Palm Motel (built in 1949), (2) the Golden Strand Hotel (built in 1946), (3) the Sahara Motel (built in 1953), (4) St. Mary Magdalen Catholic Church (built in 1961), and (5) the Temple (built in 1964). After hearing comments from interested parties, the Preservation Board declined to designate any of the sites as historic. The Preservation Board again considered the Temple for possible designation in 2008, but again decided against taking any action.

In 2009, another Orthodox Jewish congregation in Miami Beach, Beit Rambam, inquired with the Temple whether it might use some of the Temple's space for religious services. The Temple agreed, and entered into a lease agreement that permits Beit Rambam to use the main sanctuary, with the two

6

congregations jointly sharing the other areas of the property. Because the combined congregations enjoyed larger membership and their arrangement increased the overall usage of the property, the Temple revisited its 2006 plans to demolish the building and construct a larger one in its stead. The Temple therefore applied for two building permits so that it could begin its planned construction. Both were denied.

The Temple alleges that in response to its renewed interest in expansion, the City redoubled its efforts to designate the Temple a historic site. The City retained Ellen Uguccioni, a historic preservation officer with the City of Miami, to serve as a consultant for purposes of investigating whether the Temple met the criteria for historic designation enumerated in Section 171-5 of the City's Code of Ordinances and, if so, to prepare a formal report in favor of designation.[2] Uguccioni's hiring

---

[2] Section 171-5, titled "Standards for designation of archaeological and historic landmarks," provides:

> Properties may be designated as archaeological sites only if they have significance in the archaeological heritage of the area, state, or nation; and meet one or more of the following criteria:
>
> A. Are associated in a significant way with the life of a person important in the past; or
> B. Are the site of an historic event with significant effect upon the community, City, state, or nation; or
> C. Exemplify the historical, cultural, political, economic, or social trends of the community; or
> D. Have yielded, or are likely to yield, information important in prehistory or history; or
> E. Contain any subsurface remains of historical or archaeological importance or any unusual ground formations of archaeological significance; or

7

was the first time the City had ever retained a professional consultant to evaluate the historical significance of a landmark candidate.

In January 2010, Uguccioni submitted a Historic Landmark Designation Report to the Preservation Board recommending that the Temple be designated a landmark. According to Uguccioni's report, the 2004 gathering of 200 Holocaust survivors at the Temple qualified the Temple as a historic site because it rendered the Temple "the site of an historic event with significant effect upon the community, City, state, or nation." Sunny Isles Beach, Fla., Code of Ordinances § 171-5(B). The Preservation Board met in March 2010, approved Uguccioni's report, and set a June hearing to consider the Temple's designation as a historic site. The Temple applied for yet another demolition permit in April 2010, which the City again refused. Further, the City Commission enacted a resolution in May that declared a temporary moratorium on the acceptance and processing of all applications for demolition of non-residential structures pending the City's study of potential additions to the City's register of historic sites. At that time, the City had yet to designate any site as historic, and according to the complaint the Temple was the only site then under consideration for such designation.

---

F. Are designated in the City of Sunny Isles Beach Comprehensive Plan/or Florida Master Site File.

8

On June 22, 2010, the Preservation Board held a hearing to consider the designation of the Temple as a historic site.  The Temple offered witnesses against the proposed designation, but based in part upon the gathering of Holocaust survivors, in addition to the Temple's purported "exemplif[ication] [of] the historical, cultural, political, economic, or social trends of the community," *id.* § 171-5(C), the Preservation Board voted 4 to 1 to designate the main sanctuary, portico, and memorial tower of the Temple a historic site and passed Resolution No. 2010-13 to that effect.[3]  Resolution No. 2010-13, which took immediate effect, requires that the Temple "preserve the [landmarked] portions of the Temple B'Nai Zion from modification in its exterior appearance, including alteration and/or demolition," and declares that "no building permits shall be issued to alter and/or demolish the aforementioned portions of Temple B'Nai Zion."

The Sunny Isles Beach Code of Ordinances provides that "[a]ny aggrieved party may appeal any decision of the [Preservation] Board to the City Commission" within 14 days of the designation of a given property as a historic site. *Id.* § 171-4(D)(1).  "The decision of the City Commission [on appeal] shall constitute final administrative review, and no petition for rehearing or reconsideration shall be considered by the City." *Id.* § 171-4(D)(2).  In

---

[3] Uguccioni, the historical consultant, had found in her report that the sanctuary, portico, and tower had historical value, but that the social hall (where the Holocaust gathering actually took place) and connector building lacked sufficient historical value to be protected as part of the historic site.

9

conformance with that procedure, the Temple timely appealed the designation. At a public hearing held before the full City Commission on September 2, 2010, the same witnesses who had appeared before the Preservation Board appeared again and provided essentially the same testimony. Because the hearing was public, citizens were permitted to take the lectern and offer comments during the proceeding; many took the opportunity to complain about the operation of the Temple, accusing Rabbi Lankry and the Temple of removing memorial plaques from the walls, failing to light candles for deceased congregants, denying access to former congregants, and absconding with the Temple's Torahs. The City Commissioners—three out of five of whom were members of the Temple congregation before it became Orthodox—also offered public comments before voting on the designation. Commissioner Gerry Goodman, who had previously sat on the Temple's board of directors, for example, questioned Rabbi Lankry at length about why the Temple seemed to be closed to the public on certain days. Commissioner Goodman had purchased a memorial plaque for a loved one at the Temple some years earlier but had been unable to view the plaque when he attempted to do so. Goodman then began to ask Rabbi Lankry whether the Temple was being leased out, but Mayor Edelcup interjected, admonishing Goodman to "[f]ocus on the issues." Before closing his remarks, Goodman asked Rabbi Lankry whether Lankry had called him an anti-Semite in the local newspaper.

10

Following Commissioner Goodman's statement, Commissioner George

"Bud" Scholl made the following statement for the record:

> Okay.  All I can say is wow.  There is going to be some irony in my comments, because first of all, I'm the only non-Jew on the Commission, I live in the only historic house in Sunny Isles Beach, and I was the chairman of the Historic [Preservation] Board for a number of years, as was my wife, before I became Commissioner. . . . I think a lot of us are missing the point.  The fact is from my perspective the point is [sic] property rights. . . . [W]hether we like the rabbi or don't like the rabbi, whether we like the owner of the property or don't like the owner of the property, it's really not the issue.  Okay?  The issue is if we are going to burden somebody's property rights . . . .  In this case I really believe that if we are going to burden somebody's property rights, and this Commission is going to make a ruling here, and it's going to set a precedent, and you have heard me say sometimes we are judge and jury up here, and I think we need to be very careful when we are doing that and really look at the core issue.
>
> You know, emotions ran high here tonight.  I think it's very interesting and very impressive, but it's not the core issue in my mind.  The core issue is are we going to burden somebody's property rights and take something away from them over some arguments that I think are a little flimsy personally.
>
> I don't really buy into the veracity of these arguments. . . .  We have to discount our perspective toward the actual property and look at the fact that we are going to take away somebody's property rights, whether it's a temple, a single-family home, a rich condominium developer.  I don't care.  Those things need to be protected, and I think we have to hold them, you know, at a very, very high standard if we are going to burden them.

Despite Commissioner Scholl's comments, the City Commission voted 4 to

1 a few minutes later to designate the Temple as a historic site and enacted

Resolution No. 2010-1597, which affirmed the Preservation Board's June decision

11

declaring the Temple to be the City's first historic landmark. Commissioner Scholl was the lone dissenting vote. The Resolution provides, in pertinent part:

> In affirming the decision of the Board to designate the Temple as a historic site, the City Commission invites the Temple to submit plans for expansion that are consistent with the City Code and consistent with the designation of the Temple as a historic site. The City Commission expresses its belief that if the structural integrity of the items designated as historic are kept intact, the City Commission will not object to expansion plans that maintain the structural integrity of the historic items.

Following its official designation as historic, the Temple did not seek review of the merits of the City's decision via the Florida state-court procedure of common law certiorari. Instead, the Temple filed this lawsuit against the City and Norman Edelcup, alleging that the City's designation of its property as a historic landmark violated the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc–5; the Florida Religious Freedom Restoration Act of 1998 (FRFRA), Fla. Stat. §§ 761.01–.05; the Free Exercise Clause of the Florida Constitution; and the Equal Protection, Free Exercise, and Substantive Due Process Clauses of the United States Constitution by operation of 42 U.S.C. § 1983. In addition, the Temple sought a declaratory judgment that Code Section 171-5, the City Ordinance setting forth the standards for declaring historic landmarks in Sunny Isles Beach, is void for vagueness on its face.

The district court dismissed the Temple's complaint without prejudice after finding that the action was not yet ripe for review. In reaching that conclusion, the

12

court relied upon the finality principles normally applied in takings cases, pursuant to which challenges to land use regulations "[are] not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S. Ct. 3108, 3116 (1985). The district court reasoned that because the Temple's chief complaint was its inability to expand due to the historical designation, the Temple needed to submit building plans and request a waiver or variance from the City before its constitutional, RLUIPA, and FRFRA claims would become ripe for adjudication. Finally, the district court dismissed the Temple's facial challenge to Section 171-5 of the City Code based upon "prudential considerations of ripeness," which we take to mean that the district court dismissed the facial challenge so that it could be brought contemporaneously with the Temple's as-applied claims when, and if, those claims ever became ripe. The Temple appealed.

## II.

Born from both Article III and prudential concerns, "[r]ipeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538

13

U.S. 803, 807, 123 S. Ct. 2026, 2030 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 1515 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977)).  The doctrine serves the additional purpose of "shield[ing] agencies from judicial interaction 'until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Konikov v. Orange County*, 410 F.3d 1317, 1322 (11th Cir. 2005) (per curiam) (quoting *Abbott Labs.*, 387 U.S. at 148–49, 87 S. Ct. at 1515).  Put another way, "[h]aste makes waste, and the premature adjudication of legal questions compels courts to resolve matters, even constitutional matters, that may with time be satisfactorily resolved at the local level, and that may turn out differently in different settings."  *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533, 537 (6th Cir. 2010) (citations and internal quotation marks omitted).

The ripeness of a claim is a legal question that we review de novo.  *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009).  "In deciding whether a claim is ripe for adjudication or review, we look primarily at two considerations: 1) the fitness of the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration."  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224 (11th Cir. 2004).  In addition, the unique demand for a concrete factual context in certain land use disputes has led "[m]any of our

14

sister circuits" to apply *Williamson County*'s final decision requirement to certain RLUIPA claims challenging the application of land use regulations to a given property. *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 977 (9th Cir. 2011), *cert. denied*, 133 S. Ct. 423 (2012); *see Miles Christi Religious Order*, 629 F.3d at 537–38; *Grace Cmty. Church v. Lenox Township*, 544 F.3d 609, 617–18 (6th Cir. 2008); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 351 (2d Cir. 2005) (applying *Williamson County* after making a two-part preliminary inquiry); *see also Congregation Anshei Roosevelt v. Planning & Zoning Bd.*, 338 F. App'x 214, 219 (3d Cir. 2009) (affirming dismissal of RLUIPA claim as unripe based upon *Williamson County*). *Williamson County* provides that a landowner must "obtain[] a final decision regarding the application of the zoning ordinance . . . to its property" before his or her claim ripens into one justiciable in federal court. 473 U.S. at 186, 105 S. Ct. at 3116; *see Guatay*, 670 F.3d at 979 (explaining that a final decision can be obtained by filing "a variance application, a special use permit application, or . . . a single appeal of a denied permit"). In addition to RLUIPA claims, many courts have likewise applied *Williamson County*'s finality principles to related constitutional and statutory challenges to the application of local land use regulations, including substantive due process, equal protection, and First Amendment claims. *See, e.g.*, *Guatay*, 670 F.3d at 979; *Murphy*, 402 F.3d at 350 ("[W]e do not believe it necessary to distinguish the

15

RLUIPA claim from the First Amendment Free Exercise claim when it comes to our ripeness inquiry.").

Although we agree that "[t]he *Williamson County* ripeness test is a fact-sensitive inquiry that may, when circumstances warrant, be applicable to various types of land use challenges," *Murphy*, 402 F.3d at 350, we think it an inappropriate tool for the specific facts presented here. *See Roman Catholic Bishop of Springfield v. City of Springfield*, — F.3d —, No. 11-1117, 2013 WL 3782025, at *8 (1st Cir. July 22, 2013) ("While constitutional challenges to land use regulations may implicate *Williamson County's* ripeness doctrine in some cases, we find no such necessary implication here."); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (declining to apply *Williamson County* to First Amendment retaliation claim, in part because the plaintiff "suffered an injury at the moment the defendants revoked his permit, and [the plaintiff's] pursuit of a further administrative decision would do nothing to further define his injury"). In our view, where, as here, the plaintiff alleges that the mere act of designating his or her property historic was motivated by discriminatory animus, *Williamson County* is inappropriate because the injury is complete upon the municipality's initial act, and staying our hand would do nothing but perpetuate the plaintiff's alleged injury. In such cases, we think

16

traditional notions of ripeness provide the appropriate mode of analysis, and so we apply them here.

## III.

As explained earlier, under traditional principles of ripeness, "we inquire into 1) whether the issues are fit for judicial decision and 2) the hardship to the parties of withholding court consideration." *Konikov*, 410 F.3d at 1322. In the First Amendment context, our ripeness review is at its most charitable, and should any significant doubt prevail, we will resolve it in favor of justiciability. *See Harrell v. Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) ("Because this case involves an alleged violation of the First Amendment, our review of this suit's ripeness is at its most permissive."). Although the district court characterized the Temple's complaint as primarily concerning its inability to expand because of the historic designation, a close reading of the complaint reveals that the Temple's challenge is better characterized as alleging that the mere enactment of the resolution declaring it to be a historic landmark violates RLUIPA, FRFRA, and the Constitution.[4] In

---

[4] The Temple brings claims implicating RLUIPA's three main provisions: (1) the substantial burden provision, (2) the equal terms provision, and (3) the nondiscrimination provision. *See* 42 U.S.C. § 2000cc. Under the substantial burden provision, "state action substantially burdening religious exercise must be justified as the least restrictive means of furthering a compelling governmental interest." *Midrash Sephardi*, 366 F.3d at 1225 (internal quotation marks omitted); *see* § 2000cc(a)(1) (setting forth RLUIPA's substantial burden provision). The equal terms provision, for its part, prohibits any government from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution

17

other words, the Temple alleges an injury stemming from the City's initial act of designating it to be a historic site, not from the *application* of any land use regulation to its property.

It is readily apparent under traditional notions of ripeness that, on the issue of whether the City designated the Temple to be a historic site for discriminatory reasons, the record is sufficiently developed so as to render that issue fit for judicial resolution. The Temple challenges the mere fact that it has been designated historic—so framed, that issue became as ripe as it will ever be the moment the Temple was initially designated a landmark. No further factual development is necessary.

The First Circuit's recent decision in *Roman Catholic Bishop*, a case bearing facts similar to those of the present case, fortifies our view. In that case, the Roman Catholic Bishop of Springfield (Bishop) brought RLUIPA and constitutional claims against the City of Springfield (Springfield) challenging the "enforcement of a City ordinance that created a single-parcel historic district encompassing a church owned by [the Bishop]." 2013 WL 3782025, at *1. The

---

on less than equal terms with a nonreligious assembly or institution." § 2000cc(b)(1). Finally, the nondiscrimination clause forbids the "impos[ition] or implement[ation] [of] a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." *Id.* § 2000cc(b)(2). Because the language of FRFRA is largely identical to that of RLUIPA's substantial burden provision, the ripeness analysis under each statute is the same. *See* Fla. Stat. 761.03.

18

court first held that "those of [the Bishop's] claims which depend on the potential consequences of compliance with the ordinance are not ripe for adjudication, because [the Bishop] has not yet devised [his] plans for the church nor submitted any application to the [Springfield Historical Commission]." *Id.*  However, insofar as the Bishop's complaint could be read to allege "that the mere existence of the Ordinance create[d] a ripe controversy, [the court] f[ound] that [the Bishop's] claims [we]re ripe." *Id.* at \*9.  The court reasoned that because the challenges to the mere enactment of the landmarking resolution "rest[ed] solely on the existence of the Ordinance, no further factual development [was] necessary, and the Ordinance's existence . . . confront[ed] [the Bishop] with a direct and immediate dilemma." *Id.* (internal quotation marks omitted).

We likewise conclude that the Temple's RLUIPA, FRFRA, and constitutional attacks on the mere fact of its designation as a historic landmark satisfy the fitness and hardship requirements of our traditional ripeness jurisprudence, and that the Temple's claims in this regard are therefore ripe for judicial review.  *See id.*; *see also Eide v. Sarasota County*, 908 F.2d 716, 726 (11th Cir. 1990) ("[I]f a landowner's initial application for commercial zoning had been rejected . . . simply because the landowner was a redhead, the landowner's arbitrary and capricious due process claim challenging that action would be ripe.").  The Temple alleges a present injury from the City's discriminatory designation of

19

its property as historic, and to delay the resolution of these claims where no further factual development is possible would serve only to work further hardship upon the Temple.  That we will not do.  *See Roman Catholic Bishop*, 2013 WL 3782025, at \*9 (holding that the designation of a church as a historic landmark was ripe in part because the designation "presently imposes delay, uncertainty, and expense, which is sufficient to show present injury"); *see also Harrell*, 608 F.3d at 1258 (discerning no ripeness problems where plaintiff's void-for-vagueness challenge claimed an immediate injury); *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) (per curiam) ("When a plaintiff is challenging a governmental act, the issues are ripe for judicial review if a plaintiff shows he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act." (alternations and internal quotation marks omitted)); *cf. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1304 (11th Cir. 2006) (citing *Midrash Sephardi* for the notion that a zoning restriction applied to a property "constitutes an injury in fact" for purposes of standing). Moreover, the record is sufficiently developed—thanks in part to two lengthy quasi-judicial hearings held before the Preservation Board and the City Commission—that the issues we today deem ripe are clearly primed and at the ready for judicial resolution.  *See Konikov*, 410 F.3d at 1322 (articulating the general ripeness inquiry, and explaining that this inquiry "permits us to determine

20

whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court" (internal quotation marks omitted)).  We therefore vacate the district court's opinion dismissing as unripe the Temple's challenges to the mere fact of its designation as a historic site.[5]

We hasten to note the limited nature of our decision in this case.  We take no position whatever on the ultimate merits of the Temple's challenge to its designation as a historic site.  We merely hold that in the limited manner outlined above, the Temple's complaint alleges a dispute sufficiently concrete to render the instant controversy ripe and justiciable without further delay.  Whether the Temple can make a colorable showing that the City has violated the Constitution or the substantial burden and equal terms provisions of RLUIPA—and whether the Temple's claims are even cognizable under the statutory and constitutional provisions it invokes in its complaint—are questions we leave in the capable hands of the district court for resolution in the first instance.

**IV.**

---

[5] The City urges us to affirm the district court on the alternative ground that the Temple lacks standing to bring these claims because the Temple apparently leases certain parts of the premises to the Beit Rambam congregation.  We reject this argument.  As the owner of a fee simple interest in the property, the Temple has allegedly suffered an injury—the designation of its property as a historic site—that imbues it with standing to bring the limited challenge we deem ripe here.  *See Primera Iglesia*, 450 F.3d at 1304.

21

The district court also dismissed the Temple's facial void-for-vagueness challenge to City Ordinance Section 171-5 because, after finding the Temple's as-applied challenges to the historical designation were unripe, the court concluded that prudential considerations counseled in favor of postponing judicial intervention on that sole remaining claim. Because we find that the Temple's as-applied challenges to its designation as a historic site are ripe for adjudication, the prudential concerns that animated the dismissal of this count are no longer present.[6] We therefore also vacate the district court's dismissal of the Temple's facial challenge to the City's historic site ordinance.

## V.

We do not know who will ultimately prevail between the Temple and the City in this ongoing feud. That question—a merits one—is not ours to answer. We merely decide today that the claims enumerated in the Temple's complaint are ripe for judicial adjudication. And while we embrace some hope that the parties might bury their strife before the next stage of federal litigation comes to pass, again on that score, only time will tell. At this juncture, it is enough to say that the

---

[6] *Williamson County*'s finality principles do not apply to facial claims that a given regulation is constitutionally infirm. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012) ("The Supreme Court has held *Williamson County* to be inapplicable to facial challenges." (citing *Yee v. City of Escondido*, 503 U.S. 519, 533–34, 112 S. Ct. 1522, 1532 (1992))).

22

order of the district court is vacated, and that the Temple's challenges to the enactment of the historic designation are ripe for review.

**VACATED AND REMANDED.**