[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14183
_____

D.C. Docket No. 5:13-cv-00623-WTH-PRL


CARVER MIDDLE SCHOOL GAY-STRAIGHT ALLIANCE,
an unincorporated association,
H.F.,
a minor by and through parent Janine Faughnan,

Plaintiffs - Appellants,

versus

SCHOOL BOARD OF LAKE COUNTY, FLORIDA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 6, 2016)

Before MARCUS and WILLIAM PRYOR, Circuit Judges, and DAVIS,[*] District Judge.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether a complaint that a school board violated the Equal Access Act when it denied the application of the Carver Gay-Straight Alliance to form a student club is ripe and not moot and whether the Act applies to a public middle school in Florida. After a teacher at Carver Middle School submitted an application for the approval of the Carver Gay-Straight Alliance, the superintendent denied the application on the ground that the application failed to identify an allowed purpose for the club. Instead of submitting a new application, the Alliance and a student, H.F., filed a complaint that the Board had violated the First and Fourteenth Amendments to the Constitution and the Equal Access Act. Under the Act, if a public school "provides secondary education as determined by State law," the school must give extracurricular clubs equal access to school resources. 20 U.S.C. §§ 4071–72. Following a bench trial, the district court entered a judgment against the constitutional claims, dismissed the claim under the Act as both not ripe and moot, and ruled, in the alternative, that the Act does not apply to Carver Middle School. The Alliance and H.F. appeal only the dismissal of their complaint that the Board violated the Act. Because we

---

[*] Honorable Brian J. Davis, United States District Judge for the Middle District of Florida, sitting by designation.

conclude that the complaint of the Alliance and H.F. is ripe and not moot and that the Act applies to Carver Middle School, we vacate and remand for further proceedings.

## I. BACKGROUND

The School Board of Lake County, Florida, administers Carver Middle School, a public school that educates students in grades six through eight. Middle schools in Florida must provide "at least one high school level mathematics course for which students may earn high school credit." Fla. Stat. § 1003.4156(1)(b). Carver provides Algebra I to meet this obligation. The Carver Gay-Straight Alliance is an unincorporated association.

Beginning in the 2011–12 school year, students at Carver Middle School submitted applications to approve the Alliance as a student club. The principal of the school denied the first application. Students submitted another application the following school year. The new principal, Mollie Cunningham, referred the application to the Board. Because the Board determined that principals across the district inconsistently applied district policy for club formation, it held several meetings to discuss amending the policy. A student not associated with this appeal sued the Board to compel it to approve the club. The parties agreed to a consent order the next day that required the Board to approve the Alliance as a club for the

one month remaining in the school year. The Alliance held three meetings during that period.

In August 2013, the Board adopted a new policy for student clubs. The policy outlined different sets of rules for elementary, middle, and high schools. Policy 4.502 governs middle schools and requires clubs to obtain the superintendent's approval that the club meets an approved purpose:

> (2) Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.
>
> (3) All student clubs and organizations must be approved by the Superintendent before they can operate at a school.
>
> (4) All prospective clubs must submit a District approved application. The application shall include a club charter which shall set forth the purposes, qualifications for members, and the rules of conduct and shall be maintained on file for reference by all students and school employees.

Doc. 75 at 7–8. Under the policy, clubs must apply for approval each school year. The Board policy for high school clubs is more permissive and includes designations for curricular, non-curricular, and interscholastic extra-curricular activities.

During the 2013–14 school year, H.F. attended Carver and submitted an application through Heather Jablonski, a teacher at the school and the proposed

4

club sponsor. Jablonski signed the application; she did not help prepare it. The application described the following purposes and goals of the club to support LGBT students:

> (1) to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT students and their allies
>
> (2) to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students
>
> (3) to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School.

Doc. 4-11 at 2.

After the superintendent, Susan Moxley, delegated authority to Aurelia Cole, the district chief of administration, to approve or deny applications, Cole determined that the application for the Alliance did not comply with the Board policy because the club was "not an extension of the school curriculum." She returned the application to Cunningham with an email that explained the club could "resubmit an application with a charter that would qualify under current Board Policy." Cole did not then understand that she could approve clubs that "strengthen and promote critical thinking, business skills, athletic skills, and performing visual arts." But the superintendent later testified—and Jablonski and the district court agreed—that the application was deficient under Board policy

5

because it made no attempt to explain how the club would promote critical thinking.

Cole contacted Cunningham and told her that if the Alliance resubmitted and included more information on critical thinking, the club might be approved. The superintendent testified that she would have been "inclined to approve the application" had it been adequate. The Alliance did not submit another application for the 2013-14 or 2014-15 academic years.

The Alliance and H.F. sued the Board for violating the Equal Access Act and the First and Fourteenth Amendments. They sought nominal damages, a declaratory judgment, and an order enjoining the Board from denying the club access to the school forum. After a bench trial, the district court entered judgment against the constitutional claims.

The district court ruled that the claim under the Equal Access Act was both not ripe and was moot. The district court ruled that the claim was not ripe because it "depended upon facts that were not sufficiently developed." The district court reasoned that the Alliance could have resubmitted an application, and the costs to the Alliance of the delay "appear[ed] to be minimal." The district court ruled that the claim was moot because the Alliance applied for the 2013–14 school year, which had ended, and the Alliance did not submit a new application for the 2014–

6

15 school year. The district court concluded that "[t]he net result is that there is nothing to enjoin the School Board to do or not to do."

As an alternative ground for denying relief, the district court ruled that the Equal Access Act does not apply to Carver Middle School. The Act applies to secondary schools that receive federal funds and have limited open forums. 20 U.S.C. § 4071(a). The Act defines "secondary school" as any "public school which provides secondary education as determined by State law." *Id.* § 4072(1). The district court ruled that, in Florida, a secondary school means a high school.

After oral argument, we ordered the parties to address whether the Alliance continues to have organizational standing to pursue prospective relief. *See Cadet v. Bulger*, 377 F.3d 1173, 1179 (11th Cir. 2004). We directed the parties to file supplemental letter briefs on this issue. The Alliance also filed a motion to supplement the record with an affidavit establishing that its current membership includes a student who attends Carver. The Board requested a remand on this issue or an opportunity to rebut the affidavit.

## II. STANDARD OF REVIEW

We review whether an issue is moot or ripe *de novo*. *See Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1356 (11th Cir. 2013). We review questions of

7

statutory interpretation *de novo*. *See Vila v. U.S. Att'y. Gen.*, 598 F.3d 1255, 1257 (11th Cir. 2010).

### III. DISCUSSION

We divide our discussion in three parts. First, we explain that the complaint that the Board violated the Act is ripe because the Board made a final decision when it rejected the application of the Alliance to form a club. Second, we explain that the complaint also is not moot because the district court can still fashion relief for a violation of the Act. Third, we explain that the Act applies to Carver because it provides courses for high school credit and, under Florida law, these courses constitute "secondary education."

### A.  *The Complaint of the Alliance and H.F. Is Ripe.*

"The Constitution confers limited authority on the judicial branch. It endows the federal courts with '[t]he judicial Power of the United States,' and limits that power to the resolution of 'Cases' and 'Controversies.'" *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1001 (11th Cir. 2016) (quoting U.S. Const. Art. III, §§ 1–2). Article III of the U.S. Constitution restricts the ability of courts to review cases and controversies that are not ripe, "reserving limited judicial resources for individuals who face immediate, tangible harm." *Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000). "In deciding whether a claim is ripe for adjudication or review, we look primarily at two considerations: 1) the fitness of

8

the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224 (11th Cir. 2004). The doctrine "protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).

The Board argues that the complaint of the Alliance and H.F. is not ripe because they concede that their application was deficient under Board policy, yet they failed to submit a new, adequate application. The Alliance and H.F. respond that their complaint became ripe when the Board denied their application. We agree with the Alliance and H.F.

The complaint is ripe because the Board made a final and binding decision rejecting the Alliance's application. This Circuit has explained that "[in] essence, [the ripeness] doctrine deals with when a party can seek pre-enforcement review." *Elend v. Basham*, 471 F.3d 1199, 1210–11 (11th Cir. 2006). For example, in *Digital Properties*, an assistant zoning technician informed representatives of an adult entertainment company that the zoning code prohibited adult bookstores and suggested that the representatives meet with her supervisor. 121 F.3d at 588–89. The business then sued and this Court held that the complaint was not ripe because there was no "binding conclusive administrative decision." *Id.* at 590. Here, in

contrast, the Alliance submitted an application, and Cole rejected it. The Board did not create a procedure by which a club could appeal that decision. The district court reasoned that school administrators informed the Alliance multiple times that it could resubmit the application "and expound on the critical thinking" elements of the club. But that the Alliance had an opportunity to re-apply does not mean that the decision was not a formal and final decision on the application.

Because the Alliance argues that the school policy requiring a club to focus on critical thinking violated the Equal Access Act, the decision by the Board to reject the application based on that policy made the complaint fit for adjudication. The Alliance argues that, under the Equal Access Act, the Board cannot "limit non-curricular clubs to particular subject areas." The Alliance argues that the Board violated the Act when it applied its policy and rejected the Gay-Straight Alliance because it did not promote critical thinking. The facts as to that claim were developed. The district court faulted the Alliance for not resubmitting an application "embellish[ing] the description of the ways and means that the club would 'strengthen and promote critical thinking.'" But even if we could assume that the Board would have approved another hypothetical application—and we doubt that we can make that assumption—that assumed fact would not mean that the complaint of the Alliance and H.F. that the Board violated the Act when it denied their earlier application is somehow unfit for adjudication.

10

## B. The Complaint Is Not Moot.

Like the doctrine of ripeness, the doctrine of mootness "derives directly from the case-or-controversy limitation." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001). It also prevents us from issuing opinions that "would be purely advisory." *Id.* at 1339. "A case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993).

To evaluate whether their complaint is moot, we must consider the forms of relief that the Alliance and H.F. requested. The Alliance and H.F. sought nominal damages, a declaratory judgment, and an order enjoining the Board from denying the club access to the school forum. They argue that a court could grant nominal damages and that their claims are capable of repetition, yet evade review. The Board argues that a court cannot give any relief because H.F. no longer attends Carver and the Alliance expressed no interest in obtaining recognition. Although we agree that some forms of relief are foreclosed to H.F. and may be foreclosed to the Alliance, the remainder of the complaint is not moot.

H.F. cannot receive injunctive or declaratory relief. An injunction is unavailable because H.F. no longer attends Carver and cannot submit a future application. Meaningful declaratory relief is also unavailable. Although "[a] court may grant declaratory relief even though it chooses not to issue an injunction,"

11

*Powell v. McCormack*, 395 U.S. 486, 499 (1969), a court cannot grant declaratory relief when there is no "immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest," *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 125–26 (1974). H.F. has no present interest, other than vindication, in a declaratory judgment.

Nor does H.F.'s request for injunctive or declaratory relief fall under the exception for mootness for cases that are "capable of repetition, yet evade[] review." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The doctrine "applies only in exceptional situations," *id.*, where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that *the same complaining party* will be subject to the same action again," *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (emphasis added). H.F. fails to meet the second element. H.F. has completed the equivalent of graduating from Carver, so the issue, "while capable of repetition, certainly will not recur as to [H.F.]." *Sapp v. Renfroe*, 511 F.2d 172, 176 (5th Cir. 1975); *see also DeFunis v. Odegaard*, 416 U.S. 312, 319 (1974) (holding that the complaint of a law school student regarding admissions was moot because the student was about to graduate); *Adler v. Duval Cty. Sch. Bd.*, 112 F.3d 1475, 1477–78 (11th Cir. 1997) (holding that the complaint of several students that the

12

graduation ceremony policies of a school violated the First Amendment was moot because the students had graduated).

H.F.'s and the Alliance's demands for nominal damages are not moot. A court could grant nominal damages, which "are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986). In many instances, courts may grant nominal damages even when injunctive or declaratory relief is unavailable. *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1244, 1246 (11th Cir. 2011). Although district courts are not *required* to grant nominal damages where statutory rights are violated, *Walker v. Anderson Elec. Connectors*, 944 F.2d 841, 845 (11th Cir. 1991), we have not addressed whether nominal damages or any form of monetary relief can be awarded for a violation of the Equal Access Act, nor do we here, *see Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) (remanding for the district court to determine whether the Prison Reform Litigation Act precludes granting nominal damages). We have suggested that nominal damages are available for violations of other statutes. *Smith v. Allen*, 502 F.3d 1255, 1267 n.6 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011); *Murphy v. City of Flagler Beach*, 761 F.2d 622, 631 (11th Cir. 1985); *see also Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 560 nn.31–32 (11th Cir. 1984) (acknowledging that courts may

13

imply damages remedies so long as the relief is "limited to the harm done"). But we leave it to the district court to decide, in the first instance, whether the Equal Access Act affords a private right to relief, monetary or otherwise.

On this record, we cannot determine whether the request of the Alliance for injunctive or declaratory relief is moot because it is unclear whether the Alliance has organizational standing to pursue prospective relief. For the members of an organization, "[t]he requisite personal interest that must exist at the commencement of the litigation . . . must continue throughout its existence," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), but the charter members of the Alliance no longer attend Carver.

Although we have "inherent equitable powers . . . to supplement the record with information not reviewed by the district [court]," C*abalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1555 (11th Cir. 1989) (alteration in original), we decline to do so in this appeal. The parties disagree about whether the current membership of the Alliance includes a student who attends Carver. When an appeal presents a contested issue of mootness, we have allowed the district court the opportunity to address that issue first. *United States v. Prevatt*, 414 F.2d 239, 241 (5th Cir. 1969) (remanding to the district court where it was unclear whether property was within the jurisdiction of the court). Consistent with that practice, we deny the motion to

14

supplement the record and remand to the district court to determine whether the Alliance continues to have organizational standing to pursue prospective relief.

### C. The Equal Access Act Applies to Carver Middle School.

The Equal Access Act applies to "any public secondary school which receives Federal financial assistance" and permits noncurricular student groups to use school facilities. 20 U.S.C. § 4071(a)–(b). The Act defines "secondary school" as "a public school which *provides secondary education* as determined by State law." *Id.* § 4072(1) (emphasis added). So we must determine what "secondary education" means under Florida law and whether Carver provides it. Although no reported decisions of the Florida courts answer this question, "the goal of the federal courts is to try to get the same result that would be reached in the state courts." *Oliva v. Pan Am. Life Ins. Co.*, 448 F.2d 217, 221 (5th Cir. 1971). To reach that goal, we must review how Florida law uses the term "secondary education." After surveying the relevant provisions of Florida law, we conclude that secondary education, at least, means providing courses through which students can obtain high school credit.

Florida law does not expressly define "secondary education," but it does define the substantially similar term "adult secondary education" in its "K-20 Education Code." Fla. Stat. §§ 1000–1013. "'Adult secondary education' means courses *through which a person receives high school credit* that leads to the award

15

of a high school diploma or courses of instruction through which a student prepares to take the high school equivalency examination." *Id.* § 1004.02(4) (emphasis added). Because this section defines a term, we afford it great weight. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012).

"Adult" modifies "secondary education" only to distinguish the kind of student who receives the education. "Adult secondary education" is defined within the chapter of the Education Code entitled "Public Postsecondary Education." Fla. Stat. ch. 1004. Later in the same chapter, Florida law establishes that locally governed state colleges have two roles: the primary role is to provide "postsecondary academic education and career degree education," Fla. Stat. § 1004.65(5), and the subsidiary "role . . . includes the offering of programs in . . . *adult secondary education.*" *Id.* § 1004.65(6) (emphasis added). "Adult" signifies that it is adults, not adolescents, who receive education under this chapter.

Other provisions of the Education Code also suggest that the term "secondary education" means courses through which students can obtain high school credit. One provision grants certain state colleges authority to "develop charter schools that offer *secondary education.*" *Id.* § 1002.33(5) (emphasis added). That provision establishes that students can "graduat[e]" from "high school" at these charter schools, *id.*, which supports the definition in section

16

1004.02 that secondary education includes courses for which high school credit is available. Another provision requires the Department of Juvenile Justice to provide an educational program that includes, separately, "[s]econdary education" and "[h]igh school equivalency examination preparation." *Id.* § 1003.51(2)(h). To be sure, the definition of "adult secondary education" in section 1004.02 includes preparation for equivalency exams, and section 1003.51(2)(h) suggests that "secondary education" does not include that preparation. But this provision raises doubt only as to whether preparation for equivalency exams falls within "secondary education." It does not suggest that "secondary education" excludes courses through which students can obtain high school credit. Finally, with a few exceptions, colleges and universities in Florida require students to obtain a high school diploma before enrolling in programs that provide *post*-secondary education. Fla. Stat. §§ 1007.263(2)–(3) (associate degrees); State Univ. Sys. of Fla., Reg. 6.002(1)(d) (bachelor's degrees). Because "post-secondary education" comes after "secondary education," these provisions suggest that secondary education encompasses courses provided for high school credit. When read together, these provisions establish that a public school "provides secondary education" if it provides courses through which students can obtain high school credit.

17

Instead of arguing about whether Carver provides secondary education, both parties argue about whether Carver is a "secondary school" under Florida law. The district court ruled that Carver is not a "secondary school." Until July 1, 2013, Florida law defined "secondary schools" as "schools that primarily serve students in grades 6 through 12." Fla. Stat. § 1003.413(1) (2012) (repealed 2013). The district court ruled, and the Board agrees, that because the legislature repealed the definition, it intended to exclude middle schools from the term "secondary school." The Alliance and H.F. counter by citing several provisions that use the term "secondary school" as if it encompasses middle schools.

We do not find it persuasive that Florida repealed section 1003.413, which included middle schools as secondary schools. To be sure, "secondary school" is ordinarily understood as an institution "that provides secondary education." *See Secondary School*, *Webster's New International Dictionary* 2261 (2d ed. 1961). But if we concluded that Carver is not a secondary school under state law, that conclusion would not foreclose the possibility that Carver could still "provide secondary education" under state law.

The dozens of Florida statutes that use the term "secondary school" do so inconsistently. For example, one provision reads, "It is the intent of the Legislature to provide assistance to all *public secondary schools*, with a primary focus on low-performing *middle and high schools*." Fla. Stat. § 1007.35(2)(b) (emphases added);

18

*cf. id.* § 381.986 (prohibiting medical marijuana "[o]n the grounds of a preschool, primary school, or secondary school"). This provision suggests that middle schools are secondary schools. Yet, as the Board correctly argues, the definition of "school" suggests the opposite because it appears to equate secondary and high schools, *id.* § 1003.01, and another provision suggests that only high schools are secondary schools because Florida law requires secondary schools to provide "a course of study and instruction in the safe and lawful operation of a motor vehicle," *id.* § 1003.48. Because the term in the Equal Access Act that matters is "secondary education," not "secondary school," we need not delve into this tangle of provisions.

We conclude that "secondary education," under Florida law, means at least "courses through which a person receives high school credit that leads to the award of a high school diploma." *Id.* § 1004.02(4). Carver Middle School provides courses through which students can obtain high school credit. The Equal Access Act applies to Carver Middle School.

## IV. CONCLUSION

We **VACATE** the order that dismissed the complaint under the Equal Access Act and **REMAND** for further proceedings consistent with this opinion.